MENG v. EMIGRANT INDUSTRIAL SAVINGS BANK.   (No. 7568.)

(Supreme Court, Appellate Division, First Department.   July 9, 1915.) ·

1. CARRIERS ☞320, 347—INJURIES TO PASSENGER—EVIDENCE—NEGLIGENCE—
   ELEVATOR.
   In an action for the death of an elevator passenger, who fell down the shaft as he was attempting to leave the elevator, evidence *held* sufficient to warrant the jury in finding that the sole cause of the death was the negligent starting of the car by the operator while the passenger was in a place of danger, so that it was proper to submit the issues of negligence and contributory negligence to the jury.
   · [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1118, 1126, 1149, 1153, 1160, 1167, 1179, 1190, 1217, 1233, 1244, 1248, 1315–1325, 1346, 1350– 1386, 1388–1397, 1402; Dec. Dig. ☞320, 347.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. DEATH ⬤➝99—DAMAGES—EXCESSIVE DAMAGES.

A verdict for $100,000, reduced by the court to $70,000, for damages for the death of a Supreme Court Justice, earning $17,500 per year, who had six years more of his term to serve, and a life expectancy of 14 years, and who left a wife and two grandchildren surviving him, is not excessive.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 125–130; Dec. Dig. ⬤➝99.]

3. APPEAL AND ERROR ⬤➝1050—HARMLESS ERROR—ADMISSION OF EVIDENCE.

The admission of evidence that deceased had two grandchildren living is harmless, though they could not share in the damages for his death.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1068, 1069, 4153–4157, 4166; Dec. Dig. ⬤➝1050.]

4. DEATH ⬤➝60—DAMAGES—ADMISSIBILITY OF EVIDENCE.

Evidence of the age of deceased, the amount of his salary, his expectancy of life, and his manner of living is admissible to show the damage resulting from his death.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 79; Dec. Dig. ⬤➝ 60.]

5. APPEAL AND ERROR ⬤➝173—PRESENTING QUESTIONS IN LOWER COURT—LACK OF EVIDENCE.

In an action to recover, for the benefit of a widow, the damages resulting from her husband's death, where the court charged without objection that the jury could judge the widow's age from her appearance in the courtroom, and no request was made for a further charge, defendant cannot, on appeal, object that there was no evidence of the age of the widow or of the state of her health.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1079–1089, 1091–1093, 1095–1098, 1101–1120; Dec. Dig. ⬤➝173.]

Appeal from Trial Term, New York County.

Action by James S. Meng, as executor of the last will and testament of Henry Bischoff, deceased, against the Emigrant Industrial Savings Bank. Judgment for the plaintiff, and defendant appeals. Affirmed.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, DOWLING, and HOTCHKISS, JJ.

Robert M. McCormick, of New York City, for appellant.
Albert Massey, of New York City, for respondent.

HOTCHKISS, J. [1] This action was brought to recover damages for negligence causing the death of Henry Bischoff, Jr., a Justice of the Supreme Court in this department. The defendant was the owner of the premises 51 Chambers street, in this city, several of the upper floors of which, including the twelfth and thirteenth floors, were held under lease by the city of New York and were used for the purposes of the Supreme Court and the Justices thereof. On the 28th of March, 1913, Justice Bischoff came to his death by falling down the shaft of one of the several passenger elevators with which the building was equipped. The elevator in question was protected by two gates, one, called the "shaft" or "floor" gate, opening directly into the shaft from the main corridor of each of the several floors of the building, and the other a collapsible latticed or "grille" gate, which

⬤➝For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

was attached to the front of the elevator and served as a gate at the point of entrance and exit thereto. The shaft gate was operated by pneumatic power controlled by a "tripper," which came up through the floor of the car. When the operator of the car pressed his foot down upon this "tripper" the shaft door would open, and when his foot was removed the door would automatically close. The latticed gate to the car was opened and closed by the hand of the operator. The movement of the car itself was controlled by a hand lever, which, being pushed forward or back or brought to "center," would set the car in motion up or down or stop it.

The circumstances of the accident were told by two witnesses for the plaintiff. Berthoud testified that he entered the car at the ground floor of the building, taking a position at the front of the car and in front of Justice Bischoff, who stood a little way back of him. The car stopped at the eleventh floor to permit Berthoud to alight. After leaving the car, Berthoud had proceeded but a few feet into the corridor when he heard the breaking of glass, and turning around saw a black derby hat, afterwards identified as belonging to Justice Bischoff, just coming to rest, as though it had dropped on the floor of the corridor. Turning around, he saw broken glass falling from the transom or fanlight above the shaft entrance to the elevator, and the heavy glass fanlight, which was covered with wire netting, was bulged out away from the shaft and toward the corridor. Berthoud does not say where the elevator was at this time, nor does he say that he then saw Justice Bischoff in the car or elsewhere. Pearl, the operator of the car, first called as a witness for the plaintiff and afterwards for the defendant, testified:

That after Berthoud left the car he took his foot from the tripper to close the shaft door. "The door was closing, when the judge made an attempt to get off the car. I saw the door was going to strike the judge, and grabbed the judge to stop him being struck with the door. * * * Q. Did you say shut or shutting? A. Shutting. Q. It was not shut? A. No, sir. * * * I had hold of his arm, and he partly turned around when I grabbed him. The door had struck him at the same time. Then Judge Bischoff kind of pulled away from me, making an effort to get out of the door, and the door was holding the judge at the same time. Then the next thing I noticed the car had gone up, and the judge was going to be caught under the top of the door and the floor of the car. * * * I thought the best thing was to hold the judge, and I turned around to stop the car; and when I turned around to stop the car I heard a crash at the same time, and when I turned back to see what the crash was, the judge had gone. I had hold of the judge's arm, and it was torn from me. Then I turned around and stopped the car immediately. The door was about half closed. Q. Had the elevator started at that time? A. No, sir. Q. And you state that the judge was passing you? A. Yes, sir. * * * Q. When you took hold of him had the car started? A. No, sir; not that I know of."

The witness further testified that, when the judge started to leave the car, his hat was on his head. On cross-examination, with evident reluctance and only after he had been confronted with the written evidence of statements he had made to the district attorney immediately after the accident, he testified that at the time of the accident the collapsible gate was wide open, that the shaft gate was not fully closed, and that in this situation the car had been started upward by him in-

voluntarily and unintentionally, his hand then being on the lever which controlled its operation. Immediately after the accident Justice Bischoff's dead body was found at the bottom of the shaft. It was also discovered that a portion of the pneumatic apparatus which operated the shaft gate and was attached to the face of the space between floors on the inside of the shaft below the transom, and some distance above the top of the car when the car stood at rest with its floor even with the floor of the corridor, was bent upward, and also that the angle iron which supported a portion of the apparatus operating the automatic indicator, and which angle iron was similarly attached, was also bent upward.

The learned trial court left to the jury the questions of defendant's negligence and of contributory negligence on the part of Justice Bischoff. I think this was proper. It is evident that the evidence justified a finding that, at the moment immediately before the car started, Justice Bischoff stood in a position from which no danger was to be apprehended, except such as might result from his becoming impinged by the closing gate of the shaft. The fact that he was attempting to leave the car through the closing gate is not material, because, concededly, he did not succeed in so doing *before* the car started. The jury was thus justified in also finding that the sole cause of the accident was the act of the operator in starting the car while Justice Bischoff stood in a position of safety, assuming the car had remained at rest, but in such a position as would almost inevitably result in his injury if the car was then set in motion and so continued until it reached the obstacles which projected into the shaft from above.

[2, 3] The jury's verdict in favor of the plaintiff was in the sum of $100,000, which the trial court reduced to $70,000. The defendant complains of this as excessive. The evidence on the question of damages showed that Justice Bischoff left a widow, but no children; his only heirs and next of kin being two grandchildren, children of a deceased daughter. Whether, under the statute, these grandchildren have any interest in the sum recovered by the plaintiff is a question to be determined when distribution of any such recovery is to be made. It is not involved on this appeal. It is clear, however, that in any event the mere proof of the existence of grandchildren was not harmful error.

[4] At the time of his death Justice Bischoff was sixty years and 7 months of age, and his term of office would not expire for nearly 6 years, during which period, if living, he would have been in receipt of a salary of $17,500 per year. It was shown by the tables that his expectancy of life was approximately 14 years. Proof was also given tending to show the expensiveness of the manner or habit of his family life and living, all of which facts were unquestionably proper as a basis for the jury to form their judgment of the pecuniary loss suffered by those who under the statute were injured by his death. Houghkirk v. President, etc., of the Delaware & Hudson Canal Co., 92 N. Y. 219, 225, 44 Am. Rep. 370; Mix v. Hamburg-American Steamship Co., 85 App. Div. 475, 83 N. Y. Supp. 322; Sternfels v. Metropolitan Street Ry. Co. et al., 73 App. Div. 494,

498, et seq., 77 N. Y. Supp. 309, affirmed 174 N. Y. 512, 66 N. E. 1117.

[5] In his argument on this appeal, counsel for the defendant raises the point that there was no proof of Mrs. Bischoff's age at the time of her husband's death, or of her state of health at that time. If this objection had any force (and I do not mean to infer that it had), it cannot be raised now for the first time. The evidence showed that Mrs. Bischoff was present in court at the trial. In his charge the learned trial justice referred to this fact and said to the jury:

"If she is in court, possibly you can judge about her age by her looks."

No exception was taken to this, nor was the court asked to make any other or different charge upon the subject. Mrs. Bischoff's apparent age and state of health could be visually perceived, and from observation it was proper for the jury to draw for themselves such inferences as their judgment approved. Chamberlayne on Ev. §§ 1849, 2048.

The judgment and order should be affirmed, with costs. All concur.